UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. CR406-304 |
| | ) |
| CALVIN E. BASKERVILLE, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Defendant has filed a motion to suppress his post-arrest statements to Savannah police detectives, arguing generally that his statements were involuntary. He has also filed a separate motion to suppress that identifies neither the items to be suppressed, the legal basis for the motion, nor the particular facts that would justify the conclusion that suppression is required. The government filed an untimely response to these motions on November 8, 2006.[1]

---

[1] Pursuant to the scheduling order entered at the time of arraignment, doc. 6, the government's response was due by October 30, 2006. By letter dated November 8, 2006, the District Judge noted the government's failure to respond and directed that defendant's motions be resolved upon the existing record. (This the Court is unable to do, for defendant's conclusory motions do not establish any factual basis that would warrant the suppression of evidence.) AUSA DiMarino, lead counsel for the government, has not disputed that defense counsel served his motions by mail but has offered the traditional explanation that "apparently" no copies of the motions were ever received

Ordinarily, the Court will not consider an unparticularized motion to suppress, for the Court is not required to hold an evidentiary hearing unless a defendant alleges facts that, if proved, would require the grant of relief. United States v. Richardson, 764 F.2d 1514, 1527 (11th Cir. 1985). "A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented . . . . A court need not act upon general or conclusory assertions . . . ." Id. at 1527 (internal citations omitted). Nor are defendants entitled to an evidentiary hearing based on some assurance "to prove at the hearing that which they did not specifically allege in their

---

by his office. At every arraignment, the Court emphasizes both on the record and in its scheduling order the importance of timely filing motions and cautions that neglect in doing so could result in the waiver of the right to assert a motion. This principle, of course, applies equally to government counsel, who can be held to no less a standard (and are often held to a higher standard) than defense counsel who practice in this Court. In fairness to the government, the AUSAs in this district have a deserved reputation for professionalism and typically adhere closely to the Court's deadlines. But there have been some recent instances where the government has been tardy in some of its responses and even neglected to attend a scheduled Court hearing (although the latter event was remarkable for its rarity). Perhaps something has gone awry in the internal routing procedures of the U.S. Attorney's Savannah office, for notices and papers delivered to that office have evidently not been making it to the intended recipient. Like any large law firm, the U.S. Attorney's office must implement procedures that ensure the proper distribution of mail and court documents (which are often furnished to the government by multiple channels). Whatever the explanation, any deficiencies within the U.S. Attorney's office must be corrected, for future instances of untimeliness or neglect may result in the same unfortunate consequences for the government as the government would expect to be imposed upon the defense.

2

motion to suppress." United States v. Cooper, 203 F.3d 1279, 1285 (11th Cir. 2000). These principles apply with particular force where, as here, defendant's motion not only offers no supporting facts but furnishes no clue whatsoever as to what he is even seeking to suppress, except to say that he wishes to exclude all evidence obtained by the government in violation of his constitutional rights. Doc. 10. It is difficult, if not impossible, for the government to respond to such a motion or prepare for a suppression hearing, for without knowledge of a defendant's specific contentions, the government can only guess as to what witnesses to call or what evidence it should be prepared to meet at the hearing. But in this instance, the government—apparently chastened by its own neglect in failing to respond timely to defendant's motions—has elected to overlook the deficiencies of those motions and, after a pre-hearing consultation with defense counsel, has agreed to produce the witnesses and evidence pertinent to defendant's off-the-record specification of its suppression motion.

This, of course, is not the proper procedure for either asserting or responding to a motion to suppress. Nevertheless, based on the parties' stipulation and defendant's further clarification of his motion to suppress,

3

the Court agreed to receive evidence on defendant's contention that (1) the ammunition referenced in the indictment was seized in violation of his Fourth Amendment rights based upon the detectives' alleged unlawful seizure of defendant and entry of his motel room and (2) his statements to the detectives were both involuntary and made without a knowing and intelligent waiver of his <u>Miranda</u> rights.

## I. BACKGROUND

On the morning of May 18, 2005, Savannah police detectives Bill Cunningham and John Marshall were called to the Liberty Inn on Ogeechee Road in Savannah to investigate a report that a lottery machine and numerous lottery tickets had been found by housekeeping in one of the motel rooms.[2] The inn's manager informed the detectives that she had seen defendant entering and exiting the room containing the lottery machine and that she had told him to leave the premises. She furnished a physical description of defendant and stated that he was staying next door at the Bedtime Inn in Room 7.

---

[2] It was later determined that the machine had been stolen from a nearby Chevron service station.

Upon arriving at the Bedtime Inn, the detectives saw defendant standing outside of Room 7, approached him, and explained that they wanted to talk to him. When asked if he had any identification, defendant provided his name and birth date. One of the detectives then radioed dispatch and requested a criminal history check on defendant. Dispatch informed the detectives that there was an outstanding warrant for defendant's arrest from another jurisdiction. The detectives then told defendant that they were detaining him until they could determine whether officials in the foreign jurisdiction wished to extradite him. At this point the defendant became agitated and resisted the detectives' efforts to detain him. After a struggle lasting over a minute, the detectives succeeded in bringing defendant to the ground and placing him in handcuffs. Defendant then calmed down and offered no further resistance.

After a brief interval, the dispatcher informed the detectives that the arrest warrant was from New Jersey and that that state was unwilling to extradite. The detectives, however, retained defendant in their custody for the offense of obstruction by resisting their lawful efforts to detain him, and they called for a marked unit to transport defendant to police headquarters.

The manager of the Bedtime Inn then approached the detectives, informed them that defendant had not paid his bill, and requested that defendant's belongings be removed from Room 7. The detectives relayed this information to defendant, who asked them to retrieve his belongings from the room before departing the motel.[3] Defendant stood in the threshold of the door with Detective Marshall while Detective Cunningham collected defendant's belongings. Cunningham noticed several .44 caliber rounds on the dresser and asked defendant if he had a gun; defendant indicated that he did not. Cunningham found more ammunition and some jewelry in a camera box, and he placed these items and defendant's clothes in a suitcase which defendant had identified as his. When the detective opened the suitcase, he discovered more ammunition inside. Defendant told the detectives that he had the ammunition so that people would think he had a gun and "not mess with him" and that he planned to sell the ammunition in New Jersey. At the time they were collecting defendant's belongings in his motel room, the detectives did not know that defendant had been

---

[3]Defendant testified that he never gave the detectives permission to enter his motel room. He acknowledged, however, that when the officers announced that they were entering his room to collect his belongings, he said "okay." The Court credits the detectives' testimony on this point.

6

previously convicted of a felony.

When they arrived at police headquarters, the detectives placed defendant in an interview room, where Detective Marshall read him his Miranda rights using a standard form.[4]  Gov't Ex. 2.  Because defendant had previously resisted arrest, the detectives elected not to remove defendant's restraints so that he could initial and sign the waiver-of-rights form.  The defendant, however, stated that he understood his rights and was willing to speak with the detectives.  Although the focus of the interview was about the lottery machine and tickets found in the Liberty Inn, the defendant declined to discuss that subject, but during the course of the interview he again acknowledged that the suitcase was his, that he possessed and displayed the ammunition so that no one would "mess with him," and that he intended to sell the ammunition in New Jersey.  After the interview, defendant was transported to the Chatham County Detention Center.

---

[4]Defendant testified that he did not remember the detectives reading him the warnings, but the Court credits the detectives' testimony that they advised defendant of his rights.

## II. ANALYSIS

### A. Motion to Suppress Ammunition

Defendant argues that the evidence discovered after his arrest should be suppressed as the "fruit of the poisonous tree" because the arrest was "invalid." Although his precise basis for suppression is less than clear, defendant is apparently contending that the detectives violated his Fourth Amendment right to be free from unreasonable seizures when they arrested him on a New Jersey warrant knowing full well that officials from that state were unwilling to extradite and when they made a warrantless entry into his motel room without his consent. These contentions are unsupported by the evidence.

Defendant testified that he felt free to leave after he gave the detectives his name and birth date; in fact, he stated that he walked away from the detectives briefly after supplying the information. It was when the detectives radioed the information to dispatch and discovered the outstanding warrant, and defendant had returned to talk to them, that they told defendant he would be detained until it could be determined whether the warrant was for an extraditable offense. Although defendant

testified that he informed the detectives of the existence of the outstanding arrest warrant and told them that New Jersey officials would not extradite him, the Court does not credit this testimony. Moreover, even if defendant's testimony is believed, detectives aware of an out-of-state arrest warrant are not required to accept the arrestee's assurances that the foreign state will not extradite. Thus, the detectives acted properly in detaining defendant pending an official determination as to the nature of the outstanding arrest warrant and whether defendant would be extradited on the out-of-state charges.

The detectives opted to handcuff defendant when they saw that he was agitated and believed that he was searching for an escape route. When he resisted their lawful efforts to restrain him, the detectives were entitled to employ reasonable force and were justified in charging him with obstruction in violation of O.C.G.A. § 16-10-24. See Panzner v. State, 616 S.E.2d 201, 202 (Ga. Ct. App. 2005) (upholding obstruction conviction of defendant who resisted arrest by attempting to flee while being arrested on an outstanding warrant). See Barnett v. United States, 384 F.2d 848, 855 (5th Cir. 1967) (when an officer seizes an individual for the purpose of

gathering further information about a warrant issued for the individual in another jurisdiction and determining whether the foreign state is willing to extradite, this purpose is a sufficient basis for a warrantless arrest). Accordingly, defendant's apprehension was constitutional.

Nor did the detectives' subsequent entry into defendant's motel room to collect his belongings violate defendant's Fourth Amendment rights. Assuming *arguendo* that these actions constituted a search, the search was constitutional because the detectives obtained defendant's consent. Determining the voluntariness of a consent search is a question of fact to be decided from the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973). In this case, the detectives asked defendant if he wanted them to retrieve his belongings from the motel room. The defendant said that he did. Although defendant testified at the hearing that the detectives never asked him if they could enter but rather informed him of their intention to do so, thus prompting his "okay," the Court does not credit defendant's version of the events. In any event, as defendant did not contradict Detective Cunningham's statement that he wanted his belongings removed, regardless of how the inquiry was framed,

it is clear that defendant did not object to the entry of the motel room or the retrieval of his belongings. Thus, even assuming that defendant had an expectation of privacy in a motel room that he had just been instructed to vacate by the motel manager, the detectives' actions of entering the room, gathering defendant's belongings, and securing them while he was in custody did not violate defendant's Fourth Amendment rights.

### B. Motion to Suppress Statements

Defendant also argues that the statements he made to the detectives prior to his interview at police headquarters should be suppressed because the detectives did not read him the warnings required by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). The Supreme Court in <u>New York v. Quarles</u>, 467 U.S. 649 (1984), noted that the decision in <u>Miranda</u> was based on the reasoning that requiring the advisory warnings would "reduce the likelihood that suspects would fall victim to constitutionally impermissible practices of police interrogation in the presumptively coercive environment of the station house." 467 U.S. at 656. As the detectives were not interrogating defendant in the motel room, the recitation of <u>Miranda</u>

warnings in such a setting simply was not required. According to the testimony at the hearing, the detectives asked defendant questions regarding the ownership of the various items scattered about the motel room for the sole purpose of determining whether they should be packed and secured as defendant's possessions. Such questions clearly do not implicate the policy considerations of Miranda.

Regarding the questions about whether the ammunition the detectives saw in the room belonged to defendant and whether defendant had a gun, these questions clearly fall within the "public safety exception" established by the Supreme Court in Quarles. Detective Cunningham was entitled to ask these questions out of a concern for the safety of himself and others. Quarles, 467 U.S. at 655-57; United States v. Fox, 393 F.3d 52, 60 (1st Cir. 2004) (officer properly asked un-Mirandized arrestee whether he possessed any weapons in order to ensure his own safety and the safety of any passers-by).

Regarding the statements defendant made during his interview at police headquarters, defendant testified that he did not remember being read his Miranda rights. Significantly, however, he did not claim that he

was never advised of his rights. Moreover, the Court credits the detectives' testimony that Detective Marshall read defendant his rights, that Detective Cunningham initialed the form for him because defendant's hands were cuffed behind his back, and that the detectives declined to remove defendant's handcuffs because he previously put up a fight and was still perceived as a potential threat. There is no testimony that defendant did not understand his rights or that he exercised either his right to counsel or his right to remain silent. Accordingly, the Court finds that defendant was read the Miranda warnings and made a knowing and intelligent waiver of his rights.

Defendant also argues that his statements to the detectives should be suppressed because they were involuntary. The question of the voluntariness of a defendant's statements requires an inquiry as to whether law enforcement officers employed any coercive techniques to obtain those statements. The Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" Colorado v. Connelly, 479 U.S. 157, 167 (1986). The record is entirely bereft of any evidence that the detectives utilized any coercive techniques

in this case, and the Court finds that defendant's statements were freely and voluntarily made.

## III. CONCLUSION

The detectives' arrest of defendant and their subsequent entry into his motel room and the securing of his belongings was constitutional. A recitation of defendant's <u>Miranda</u> rights was not required until immediately prior to his jailhouse interview, when the detectives did read him his rights. Further, defendant's statements to the detectives were entirely voluntary. Based on the foregoing, defendant's motion to suppress (doc. 10) and motion to suppress statements (doc. 9) should be DENIED.

**SO REPORTED AND RECOMMENDED** this 21st day of **November, 2006.**

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA